UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

RONISHA ANDREWS, PAK SEONG HOI, and LORRAINE ROCCI, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

EXPEDIA GROUP, INC., a Delaware corporation,

Defendant.

CASE NO.

**COMPLAINT—CLASS ACTION**

**DEMAND FOR JURY TRIAL**

## I. INTRODUCTION

1. Long the object of consumer complaints for trapping them into hotel accommodations they cannot cancel without loss, among other abuses, Defendant Expedia Group, Inc. ("Expedia") has devised another way to exploit consumers. It has abused its monopoly power to impose exclusionary contracts and pricing algorithms on hotels in violation of the federal antitrust laws. As a result, Expedia has forced millions of consumers to pay artificially inflated prices for hotel rooms in the United States. Due to Expedia's exclusionary scheme ("Scheme" or "Challenged Conduct"), hotel room prices are not only inflated when purchased through Expedia's online travel agency websites ("OTAs"), but also when bought through hotels' own websites, mobile applications, call centers, or loyalty program portals



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

("Direct-Booked Channel"), and through non-Expedia OTAs as well.[1] Expedia's anticompetitive Scheme has injured virtually every consumer who has booked a U.S. hotel room—whether through Expedia or not.

2. Plaintiffs file this Class Action Complaint against Expedia on behalf of themselves and two proposed classes:

a. **Direct-Booked Class:** All persons and entities in the United States who, during the period from October 2, 2022, through the date the Challenged Conduct ceases (the "Class Period"), directly purchased a U.S. hotel accommodation from a Listed Hotel (defined below) through the Listed Hotel's Direct-Booked Channel.

b. **OTA Class:** All persons and entities in the United States who, during the Class Period, purchased a U.S. hotel accommodation at a Listed Hotel by making the reservation for the hotel accommodation through a Non-Expedia OTA, and paying for the accommodation either directly to the hotel or directly to the Non-Expedia OTA.

3. During the Class Period, Plaintiff Lorraine Rocci and thousands of similarly situated consumers in the Direct-Booked Class purchased accommodations directly from one or more Listed Hotels on the Listed Hotels' Direct-Booked Channel. Listed Hotels are hotels located in the United States or its territories that list U.S. accommodations on an Expedia OTA. Examples of Listed Hotels include, but are not limited to, hotels that are operated, managed, franchised, or licensed under a brand owned or controlled by any of the following hotel groups, or their subsidiaries, affiliates, or successors: Marriott International, Inc.; Hilton Worldwide Holdings Inc.; InterContinental Hotels Group PLC; Wyndham Hotels & Resorts, Inc.; Choice Hotels International, Inc.; Hyatt Hotels Corporation; Best Western International, Inc.; Accor S.A.; Sonesta International Hotels Corporation; ESA Management, LLC; and G6 Hospitality

---

[1] As used in this Complaint, "Expedia OTAs" include the following OTAs operated by Expedia: Expedia.com, Hotels.com, Travelocity, Orbitz, and CheapTickets. "Non-Expedia OTAs" are OTAs operated by companies other than Expedia, including Booking.com, Priceline, Agoda, and Trip.com.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

LLC. The Challenged Conduct artificially inflated the rates Listed Hotels charged Direct-Booked Class members for accommodations booked on the Direct-Booked Channel. Accordingly, members of the Direct-Booked Class overpaid for their Listed Hotel accommodations as a result of Expedia's Scheme in violation of Sections 1 & 2 of the Sherman Act.

4. During the Class Period, Plaintiffs Ronisha Andrews and Pak Seong (James) Hoi and thousands of similarly situated consumers in the OTA Class purchased accommodations at Listed Hotels in the United States or its Territories by reserving them through a Non-Expedia OTA (the "OTA Class"). Members of the OTA Class overpaid for their Listed Hotel accommodations as a result of Expedia's conduct in violation of Sections 1 & 2 of the Sherman Act challenged herein.

5. Expedia is the dominant OTA in the U.S. Hotel OTA Market (defined below), facilitating nearly 80% of the gross booking value (in dollars) of transactions between U.S. consumers and U.S.-based hotels booked through OTAs. Hotels in the United States cannot reach a commercially meaningful share of travelers who book hotel stays online without listing on Expedia because, as the exclusive gateway to a large share of the hotel-booking consumers, it is a "must-list" OTA for U.S.-based hotels. In addition, nearly every U.S.-based hotel lists accommodations on Expedia. Expedia uses the leverage it gains from such dominance and its "must have" status to impose the anticompetitive restraints that are the subject of this Complaint. As a result of those restraints, Expedia is able to charge Listed Hotels a commission of approximately 15% of each booking's value—and as much as 25% to 30% for hotels that buy additional visibility to consumers—on every booking through Expedia. Because the commission is a percentage of an accommodation's booking value, and a cost the hotel must recover in order to be profitable, it is built into the accommodation rate the consumer pays. For the reasons described below, Expedia's anticompetitive conduct forces Listed Hotels to impose this cost burden and charge artificially inflated prices not just on accommodations booked through Expedia, but across all of the Listed Hotels' sales channels, including on bookings made through



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

the Listed Hotels' own websites or phone lines (the Direct-Booked Channel) and on bookings made through rival OTAs.

6. Expedia abuses its monopoly power—and causes inflated prices on the Direct-Booked and Rival OTA Channels—through two distinct but related practices: (a) imposing contractual most-favored-nation provisions (the "Contractual MFN") in its contracts with Listed Hotels; and (b) imposing restraints that algorithmically punish hotels that offer lower prices on non-Expedia sales channels by demoting Listed Hotels in Expedia's search results (the "Algorithmic MFN Restraints," and together with the Contractual MFN, the "Challenged Conduct," "Scheme," or "MFN Restraints").

a. ***First***, the Contractual MFN in Expedia's standard agreement with hotels ("Hotel Agreement") forbids Listed Hotels from offering lower rates on their own websites (or other distribution methods, such as phone lines) than they offer on transactions advertised and booked through Expedia. Pursuant to the Contractual MFN, all Listed Hotels "agree that the Rates and Rate Plans you provide to Expedia will be equal to or better than those made available through your own Online Public booking or your own Online Public distribution channels."

b. ***Second***, through Expedia's Algorithmic MFN Restraints, Expedia punishes Listed Hotels that post lower prices on rival OTAs such as Booking.com, Priceline, Agoda, and Trip.com ("Non-Expedia OTAs") by demoting them in the search results that drive the majority of U.S. OTA bookings. The Algorithmic MFN Restraints include four mechanisms: (a) a "Rate Competitiveness" ranking factor that demotes hotels offering lower rates elsewhere; (b) a "Most Likely to Convert" ranking factor, a conversion-optimization algorithm that penalizes hotels whose lower prices on Non-Expedia OTAs reduce Expedia OTA booking probability; (c) a self-executing "automatic rate match" tool that hotels are coerced to use to adjust their Expedia OTA rates to match their lowest prices on any competing OTA while rewarding compliance with increased visibility; and



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

(d) a VIP Access program that conditions enhanced visibility and marketing benefits on rate parity and, further, requires participating hotels to price rooms to key customers 10-25% higher on non-Expedia channels than those booked through Expedia indefinitely. Through these practices, Expedia ensures that rival OTAs cannot offer a lower price for the same accommodation as is available on Expedia. Together, the Algorithmic MFN Restraints make it economically infeasible for Listed Hotels to offer accommodations at rates that are discounted below the inflated rates for which they must offer those accommodations on Expedia's OTAs.

7. Through the Challenged Conduct, Expedia suppresses price competition for accommodations between (a) Expedia OTAs and Direct-Booked Channels, as well as between (b) Expedia OTAs and Non-Expedia OTAs. Expedia's Contractual MFN bars hotels from offering lower rates on their own websites than the prices they offer on Expedia, even though rooms sold through Expedia incur a large Expedia commission and rooms booked through Direct-Booked Channels do not. As a result, and due to the Challenged Conduct, hotels must artificially inflate the prices in the Direct-Booked Channel even though it is less expensive to sell through that channel.

8. Moreover, Expedia's Algorithmic MFN Restraints make it economically infeasible to charge less on Non-Expedia OTAs than on Expedia. These restraints demote any hotel that posts a lower price on a competing OTA in the search algorithm. As a result, rival OTAs cannot incentivize hotels using their platforms to charge lower prices for hotel accommodations to consumers buying through their platforms by charging those hotels lower commissions. The Challenged Conduct suppresses price competition across every distribution channel—on OTAs (both Expedia's and non-Expedia's) and on Listed Hotel Direct-Booked Channels—trapping consumers into paying artificially inflated prices on U.S. hotel accommodations no matter how they book.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

9. This Complaint focuses on the effects the Challenged Conduct has on the two groups of purchasers that constitute the two Classes:

a. ***First***, Expedia's Challenged Conduct harms a group of consumers, members of the Direct-Booked Class, who directly purchase accommodations from Listed Hotels through the Listed Hotels' Direct-Booked Channels. A Listed Hotel's Direct-Booked Channel carries no OTA commission at all, and absent the Challenged Conduct, Listed Hotels would charge less for accommodations booked directly through them (on their websites, etc.) because it costs less for hotels to sell through that channel (where there are no commissions). Consumers who directly purchase U.S.-based accommodations from Listed Hotels are members of the Direct-Booked Class. Their injury (paying artificially inflated prices) is the means by which Expedia protects its commissions: by inflating the prices direct-booking consumers pay, the Contractual MFN reduces incentives for consumers to book direct. That injury is a necessary means by which Expedia achieves its anticompetitive ends and is inextricably intertwined with the injury Expedia inflicts on competition in the Hotel OTA Market.

b. ***Second***, Expedia's Challenged Conduct harms consumers who purchase accommodations at U.S.-based Listed Hotels by reserving them through Non-Expedia OTAs. Because the Challenged Conduct makes it economically infeasible for Listed Hotels to translate a Non-Expedia OTA's lower commission into a lower posted hotel room price, Expedia's Scheme makes it economically irrational for Non-Expedia OTAs to compete with Expedia by cutting commissions. As a result of the Challenged Conduct, if a Non-Expedia OTA charges hotels lower commissions, it will not result in lower accommodation prices, and thus the Non-Expedia OTA will not get more bookings through rival OTA platforms. Thus, due to the Challenged Conduct, Non-Expedia OTA commissions stay inflated, and the consumers who book through Non-Expedia



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

OTAs pay the resulting artificially inflated room rates. Consumers who purchase U.S.-based accommodations at Listed Hotels by reserving them through Non-Expedia OTAs are members of the OTA Class.

10. Expedia's Challenged Conduct has also degraded OTA service quality marketwide. Insulated from the competitive discipline that would otherwise have forced Expedia to compete on the non-price dimensions of service, transparency, and remediation, Expedia has maintained opaque fees, restrictive refund and cancellation policies, and unresponsive customer service that a competitively disciplined OTA would have been forced to correct. That degradation is the predictable consequence of the same monopoly maintenance practices challenged here that suppress price competition: with rival OTAs foreclosed from competing on price, they face weakened incentives to compete on quality. As a result, Expedia has diminished incentives to compete on quality.

11. Expedia's Challenged Conduct, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, has collectively caused the members of both Classes to pay substantial overcharges. Plaintiffs bring this action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking treble damages, injunctive relief, and other appropriate remedies.

## II. JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

13. Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)-(c). Expedia Group, Inc. is headquartered in Seattle, Washington, within this District. A substantial part of the events giving rise to the claims occurred in this District, including Expedia's formulation, adoption, implementation, and enforcement of the Challenged Conduct. Expedia transacts business in this District and is subject to personal jurisdiction here.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

14. The Challenged Conduct has had, and continues to have, a substantial effect on interstate commerce. Hotels located throughout the United States list accommodations on OTAs operated by Expedia and its rivals. U.S. consumers in every state book hotel rooms through Expedia OTAs, Non-Expedia OTAs, and directly from hotels affected by the Challenged Conduct. Collectively, the booking activity at issue in this case, on OTAs and through hotels' Direct-Booked Channels across the United States, amounts to billions of dollars of interstate commerce.

## III. PARTIES

15. Plaintiff Lorraine Rocci is a natural person who resides in Royersford, Pennsylvania. During the Class Period, Plaintiff Rocci booked and paid for U.S. accommodations directly from Hilton through its Direct-Booked Channel. As a result of Expedia's Challenged Conduct, Plaintiff Rocci paid rates for accommodations directly to Hilton (a Listed Hotel) that were artificially inflated.

16. Plaintiff Ronisha Andrews is a natural person who resides in Carlsbad, California. During the Class Period, Plaintiff Andrews booked U.S. accommodations at a Listed Hotel, the WoodSpring Suites Santee – San Diego Northeast in Santee, California, through Priceline, a Non-Expedia OTA. As a result of Expedia's Challenged Conduct, Plaintiff Andrews paid rates for accommodations that were artificially inflated.

17. Plaintiff Pak Seong Hoi is a natural person who resides in Bellevue, Washington. During the Class Period, Plaintiff Hoi booked accommodations at a Listed Hotel, the Davenport Tower, Autograph Collection in Spokane, Washington, through Priceline, a Non-Expedia OTA. As a result of Expedia's Challenged Conduct, Plaintiff Hoi paid rates for hotel accommodations that were artificially inflated.

18. Defendant Expedia Group, Inc. is a Delaware corporation with its principal place of business at 1111 Expedia Group Way West, Seattle, Washington 98119. Expedia operates OTAs that connect hotels seeking distribution with consumers seeking accommodations. Expedia's OTAs include Expedia.com, Hotels.com, Travelocity, Orbitz, and CheapTickets.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Collectively, throughout the Class Period, Expedia OTAs have comprised more than 70% of gross hotel bookings in dollars transacted through Hotel OTAs across the United States.

## IV. FACTUAL ALLEGATIONS

### *A. The Hotel OTA Industry*

19. Hotels distribute their rooms to consumers through two principal channels: (a) OTAs such as, *e.g.*, Expedia and Booking.com; and (b) the hotels' own Direct-Booked Channels (as explained *infra*).

20. Hotel OTAs are internet-based websites that aggregate hotel inventory and allow consumers to search, compare, and book accommodations from multiple hotels in a single interface. Hotel OTAs offer hotels a distribution channel to reach consumers specifically engaged in looking for accommodations and offer consumers an avenue to discover, reserve, and pay for accommodations.

21. For the vast majority of U.S.-based hotels (including all of the Listed Hotels), OTAs represent a critical source of bookings because of their large bases of consumers specifically engaged in looking for accommodations. OTAs provide hotels with a discrete service: access to a large group of incremental customers a hotel would not otherwise reach, particularly infrequent or first-time leisure travelers who use OTA websites to discover and compare lodging. Expedia itself markets this function to hotels, representing that listing with Expedia places a hotel before a large audience of already-engaged travelers. While the service an OTA provides offers some value to some consumers on some occasions, that value is bounded: it consists principally of one-time customer discovery, after which the hotel bears the cost and effort of delivering the stay and converting the guest into a returning, direct-booking customer. Moreover, because Expedia makes it seem like its websites are the hotels' own websites, and pays Google to help them trick consumers, many consumers do not even know they are using Expedia and not the hotel's own websites or simply the results of a Google search. The commission Expedia charges, described below, vastly exceeds the value of that bounded



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

discovery function and persists at supracompetitive levels only because the Challenged Conduct forecloses price competition that would otherwise prevail.

22. In exchange for their services, OTAs charge hotels a commission on each completed booking. Commission rates and contracting structures vary but are typically set as a percentage of the total room price paid by the consumer. Two common contracting structures are the "agency" and "merchant" models.[2] Under the agency model, the hotel sets the retail rate paid by the consumer, the OTA facilitates the booking, the guest pays the hotel directly, and the hotel subsequently remits a commission to the OTA calculated as a percentage of the room rate. Under the merchant model, the OTA negotiates a discounted net rate from the hotel, markets the room to consumers at a marked-up retail rate, collects payment from the consumer as merchant of record at the time of booking, and remits the net rate to the hotel following the guest's stay, retaining the spread between the retail and net rates as its take.

***B. Direct-Booked Hotel Accommodations***

23. Direct-Booked Hotel Accommodations are accommodations reserved directly from a hotel, hotel chain, or hotel property through distribution channels controlled by the hotel, such as the hotel's own website, mobile application, call center, or loyalty program portal ("Direct-Booked Channels").

24. Direct-Booked Channels are functionally and economically distinct from Hotel OTAs. When a consumer books a hotel room through a Direct-Booked Channel, the hotel receives the full room price without paying a commission to any OTA or third party. Because hotels avoid OTA commissions on Direct-Booked Hotel Accommodations, Direct-Booked Channels are substantially more profitable for hotels on a per-booking basis. Whereas OTAs aggregate listings from hundreds of thousands of hotels and provide cross-property search, comparison, and review functionalities, a hotel's Direct-Booked Channel provides consumers with access to that specific hotel's (or hotel chain's) room inventory, often with benefits

[2] Expedia also utilizes an "advertising model," where it sells hotels paid placement and visibility across its transaction-based websites and its majority-owned metasearch site, Trivago, in exchange for a fee that buys only impressions and referral traffic.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

unavailable through OTAs such as hotel loyalty program points, guaranteed room preferences, direct communication with the property, price-match guarantees, and flexible cancellation policies. OTAs and Direct-Booked Channels therefore serve distinct consumer needs and use cases.

25. In a competitive market, absent the Challenged Conduct, hotels would have strong incentives to steer consumers to Direct-Booked Channels by offering lower prices on those channels than on accommodations booked through OTAs, because it costs hotels less to sell through Direct-Booked Channels (where there are no OTA commissions). Absent the Challenged Conduct, this dynamic would, in turn, create competitive pressure on OTAs to lower their commission rates to retain hotel inventory and consumer bookings.

### *C. Expedia's Contractual MFN Clause*

26. An MFN clause is a contractual provision that punishes a seller for offering its products or services for lower prices through channels other than the one the clause protects, thereby guaranteeing the protected provider from being undersold on those other channels.

27. Expedia maintains a Contractual MFN applicable to Listed Hotels. Expedia's standard Hotel Agreement with Listed Hotels sets out the Contractual MFN in Section C.1: "Unless you are located in Australia, you agree that the Rates and Rate Plans you provide to Expedia will be equal to or better than those made available through your own Online Public booking or your own Online Public distribution channels."[3]

28. The practical effect of the Contractual MFN is to prohibit Listed Hotels from offering consumers lower rates on their Direct-Booked Channels than rates listed on Expedia websites. A hotel that wishes to steer customers to direct bookings by offering a 10% discount on its own website—because it costs the hotel less to sell on its Direct-Booked Channel than to sell through Expedia's OTA at commission rates of 15% or more—is contractually barred from doing so.

---

[3] Expedia Lodging Agreement, https://api.expediapartnercentral.com/contract/ext/templatepdf?language=2057&version=323.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

29. Foreign competition authorities and courts have found the type of OTA MFN akin to Expedia's Contractual MFN—one requiring inflated prices on a hotel's Direct-Booked Channel—to be anticompetitive. On September 19, 2024, the Court of Justice of the European Union ("CJEU") held in *Booking.com BV v. 25hours Hotel Co. Berlin GmbH*, Case C-264/23, that MFN clauses restricting Direct-Booked Channels are not "objectively necessary" to the operation of a hotel-reservation platform and are therefore not "ancillary restraints," bringing them within the prohibition on anticompetitive agreements in Article 101(1) of the Treaty on the Functioning of the European Union. The CJEU emphasized that operation of the OTA service "has not been compromised" in Member States where such clauses were prohibited.[4] Likewise, in Germany, the Bundeskartellamt (the German federal cartel office) found the same type of MFN Clause used by the foreign OTA Hotel Reservation Service, materially identical to Expedia's Contractual MFN at issue here, infringed EU and German competition law. The same agency subsequently prohibited Booking.com's similar MFN clause on the same reasoning. And after the European Commission designated Booking Holdings Inc. a "gatekeeper" under the EU Digital Markets Act in May 2024—triggering Article 5(3), which prohibits gatekeepers from applying MFN clauses of the type Expedia imposes here—Booking.com removed all MFN clauses similar to Expedia's Contractual MFN from its agreements with hotels across the European Economic Area to comply.

30. Expedia itself has demonstrated that its Contractual MFN is not necessary to operate its OTAs. Following an Australian Competition and Consumer Commission investigation and proposed legislation that would have banned MFN clauses like Expedia's Contractual MFN, Expedia unilaterally waived its Contractual MFN as to Australian hotels in

[4] Court of Justice of the European Union, *Booking.com BV v. 25hours Hotel Co. Berlin GmbH*, Case C-264/23, ECLI:EU:C:2024:764 (Sept. 19, 2024) (holding that MFN clauses are not objectively necessary to, or proportionate to, the operation of a hotel-reservation platform, and therefore do not qualify as ancillary restraints exempt from Article 101(1) TFEU); *see also* Press Release, CJEU, *Online Accommodation Reservation Platforms: Price Parity Clauses Cannot, in Principle, Be Classified as 'Ancillary Restraints' for the Purposes of EU Competition Law* (Sept. 19, 2024), https://curia.europa.eu/jcms/upload/docs/application/pdf/2024-09/cp240145en.pdf.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

March 2019, and Section C.1 of Expedia's standard Hotel Agreement now carves them out of the Contractual MFN, yet Expedia has nonetheless continued to list accommodations at hotels in Australia.

### ***D. Expedia's Algorithmic MFN Restraints Operate as an MFN that Inflates U.S. Hotel Accommodation Pricing on Non-Expedia OTAs***

31. Beyond its explicit Contractual MFN, Expedia maintains and enforces Algorithmic MFN Restraints, a suite of policies and algorithmic mechanisms that, collectively, function as a *de facto* MFN that causes Listed Hotels to inflate room prices on accommodations booked through Non-Expedia OTAs. These policies include: (1) Rate Competitiveness in Search Rankings; (2) "Most Likely to Convert" Ranking Criteria; (3) the Automatic Rate Match tool; and (4) the VIP Access Program. These Algorithmic MFN Restraints penalize hotels for offering lower prices on competing OTAs—not just on the hotel's own Direct-Booked Channel—by reducing the hotel's visibility on Expedia's OTAs as a penalty for charging lower rates on Non-Expedia OTAs. The combined effect of the Algorithmic MFN Restraints is to extend Expedia's anticompetitive MFN requirements to all distribution channels. Expedia's Algorithmic MFN Restraints work as described below.

32. ***First***, Expedia uses a program it calls "rate competitiveness" as a key factor in its search-ranking algorithm ("Rate Maintenance").[5] Rate Maintenance is defined by reference to whether the hotel is "providing travelers with the best rates and deals"—*i.e.*, whether the hotel is refusing to provide discounted rates on Non-Expedia OTAs or on the hotel's Direct-Booked

[5] Expedia Grp., Boost Property Visibility: Optimize Guest Experience & Offer Strength, https://partner.expediagroup.com/en-us/resources/blog/travel-marketplace-visibility-guide (Expedia's own description of its property-ranking algorithm, stating that its "proprietary search algorithm" ensures "the strongest offers—the ones most likely to convert to bookings—show at the top of the traveler search results," and identifying "rate competitiveness" among the signals that determine offer strength and sort order); Expedia Grp. Partner Cent., Influence Your Visibility, https://discover.expediapartnercentral.com/grow-your-business/influence-your-visibility/ (describing "Offer Strength" and "Quality Score"—the latter accounting for "your room and rate competitiveness on Expedia Group sites"—as measures that determine a property's "visibility" and sort-order placement).



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Channel. Expedia's own public guidance to hotel partners identifies "offer strength" factors that determine a hotel's position in search results, which explicitly consider Rate Maintenance:




33. Expedia's Rate Maintenance program thus demotes those hotels that offer lower rates for equivalent rooms in their own property or properties on competing OTAs in Expedia's search result algorithm. Prime positioning in Expedia's search results is critical to hotels' ability to market and sell their accommodations, and any factor that demotes a hotel in Expedia's search results significantly reduces the hotel's visibility to Expedia's large consumer base and thereby decreases the hotel's accommodation booking volume. Because approximately 78% of gross U.S. hotel OTA booking value in dollars flows through Expedia, a reduction in search-result visibility on Expedia can significantly reduce a hotel's total bookings. Expedia's Rate Maintenance program thus strongly incentivizes hotels not to discount accommodations more aggressively on Non-Expedia OTAs than on Expedia's OTAs in order to preserve their Expedia visibility—even if offering those rooms on Non-Expedia OTAs would be more profitable to hotels on a per-booking basis and/or would enable consumers to obtain lower prices on those bookings.

34. ***Second***, Expedia explicitly states that its algorithm ranks accommodation offers that are "most likely to convert to bookings" (the "Most Likely to Convert" program).[6] A hotel

[6] Expedia Grp., Boost Property Visibility: Optimize Guest Experience & Offer Strength, https://partner.expediagroup.com/en-us/resources/blog/travel-marketplace-visibility-guide.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

that lists lower prices on a competing OTA reduces the probability that a consumer will complete a booking on Expedia, because a price-conscious consumer will likely search for the lowest price and book through the non-Expedia channel or website offering that lowest price. Expedia's Most Likely to Convert program thus reinforces the power of its other Algorithmic MFN Restraints by inherently penalizing hotels that discount more aggressively on Non-Expedia OTAs than on Expedia's OTAs.

35. ***Third***, Expedia offers hotels an "automatic rate match" tool within Expedia Group Partner Central ("Automatic Rate Match"). According to Expedia, Automatic Rate Match "alerts you when there are rate discrepancies across your listings" and "adjusts the listing" on Expedia Group websites "to ensure travelers always see the best available rate."[7] The tool both enforces rate parity across OTA websites and rewards hotels for compliance with rate parity. In marketing the tool, Expedia itself acknowledges that visibility depends on rate-matching, stating that applying rate-matching leads to "[i]ncreased visibility and bookings."[8] By automating rate-matching and tying it directly to search visibility, which is crucially important to hotels that list on Expedia OTAs, Automatic Rate Match suppresses rate competition on Non-Expedia OTA channels because the tool acts as a self-executing mechanism that hotels are economically coerced into adopting.

---

[7] Expedia Grp., Hotel drives bookings with rate match automation, https://partner.expediagroup.com/en-us/resources/case-studies/hotel-drives-bookings-with-rate-match-automation.

[8] *Id.*



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com




36. ***Fourth***, Expedia operates a VIP Access program that provides participating hotels with enhanced visibility, an "exclusive VIP Access badge," as well as "Expedia Group-funded marketing campaigns that reach millions of members."[9] Average booking values for VIP Access properties are 42% higher than those for non-participating hotels. To be eligible for VIP Access, hotels must have a high "offer strength score." Because Expedia makes what it calls "rate competitiveness" a key contributor to the "offer strength score," VIP Access eligibility is effectively conditioned on maintaining rate parity across all distribution channels, *i.e.*, it economically disincentivizes hotels from more aggressively discounting on Non-Expedia OTAs than on Expedia's OTAs. Moreover, VIP Access participants are required to price rooms to key customers 10-25% higher on non-Expedia channels indefinitely. This requirement forces

---

[9] Expedia Grp., Join VIP Access Program for Top Hotel Properties, https://partner.expediagroup.com/en-us/industries/hotels/vip-access-program (Expedia's U.S. partner page stating that VIP Access properties must "have an excellent guest experience and offer strength score," that participating properties offering a Members Only Deal must provide member discounts and "apply the Members Only Deals to all rooms and rates, use it in addition to current and future promotions, and keep it active with no end date," and describing VIP Access benefits including an "exclusive VIP Access badge" and "Expedia Group-funded marketing campaigns that reach millions of members").



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

participating hotels to offer prices on non-Expedia distribution channels that are not merely at parity but actually higher than their prices on Expedia—transforming the *de facto* parity requirement into a market-wide *de facto* price-inflation guarantee.

37. Empirical studies of similar OTA restraints in jurisdictions that banned MFN clauses have concluded that OTAs had enforced similar MFN restraints by monitoring hotel rates across channels with automated rate-checking tools and demoting in search rankings (“dimming”) any hotel that posted a lower price on a competing channel, while rewarding compliant hotels with superior placement. Expedia’s Algorithmic MFN Restraints operate as precisely this kind of MFN enforcement. Because hotels depend on favorable placement on Expedia—which, as discussed below, operates OTAs that account for approximately 80% of U.S. hotel OTA gross bookings by dollar value—they respond to these preferencing programs by maintaining rate parity across all channels.

38. Prime placement in Expedia’s search results is critical to a hotel’s ability to reach consumers because consumer search behavior on OTAs concentrates heavily on the top of the online search results page. Independent research on consumer search behavior has found that approximately 53 percent of organic search clicks flow to the first link on a results page. Expedia itself has publicly acknowledged that this dynamic drives consumer behavior on its OTAs: in an April 2016 white paper titled “Understanding the Science Behind Expedia’s Marketplace,” authored by Expedia’s Senior Vice President of the Global Partner Group, Expedia stated that although consumers are able to reorder results by other criteria, “most consumers find the pre-sorted filter most helpful.”[10] Expedia admits in the same white paper that discounted rates offered only on a hotel chain’s own site can negatively affect the hotel’s Quality Score on Expedia, and that hotels offering lower rates on other channels than they offer on Expedia will lose relative share on Expedia’s marketplace, experience reduced traffic to their direct websites through the loss of Expedia’s billboard effect, and due to the Challenged Conduct face over time

[10] Melissa Maher, Expedia, Inc., Understanding the Science Behind Expedia’s Marketplace: What Drives Hotel Visibility Online (April 2016).



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

higher marketing and customer-acquisition costs. As a result of these consumer-search dynamics and Expedia's own algorithm design, any factor that demotes a hotel in Expedia's default sort, *i.e.*, the Algorithmic MFN Restraints, significantly reduces the hotel's booking volume from Expedia's consumer base and gives Expedia's Algorithmic MFN Restraints substantial coercive effect on hotels that list on Expedia OTAs.

39. Similar restraints to Expedia's Algorithmic MFN Restraints—similar ranking-based and preferred-partner mechanisms—have been found anticompetitive by foreign competition authorities. For example, on July 29, 2024, the Spanish competition authority (Comisión Nacional de los Mercados y la Competencia or "CNMC") imposed fines totaling €413.24 million on Booking.com—the largest fine in CNMC history—for abusing its dominant position in that market through mechanisms of this kind. The CNMC found that Booking.com's use of a hotel's total volume of Booking.com bookings as a criterion in its default search-results ranking, and its conditioning of access to its "Preferred Partner" and "Preferred Partner Plus" programs on each hotel's profitability to Booking.com, together incentivized hotels to concentrate sales on Booking.com and foreclosed rival OTAs. Those mechanisms are structurally identical to Expedia's Algorithmic MFN Restraints, as each ties a hotel's search visibility and preferred-partner status to metrics that reward parity with competing sales channels, *i.e.*, rival OTAs and hotel Direct-Booked Channels, and penalizes discounting on those channels.

40. Industry commentary confirms the understanding that maintaining rate parity between its direct-booked and OTA channels (and within the OTA channel) is important for a hotel to secure economically crucial favorable visibility on Expedia. As one hotel-technology vendor advises hotels, "[r]ate parity on Expedia is not optional," because Expedia's algorithm "actively checks whether you're offering better rates on competing platforms or your own



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

website" and, when it detects that a lower price is available elsewhere, "flags the discrepancy and reduces your listing's competitiveness in search."[11]

## V. MONOPOLY POWER

41. Expedia's monopoly power is reflected through both direct and indirect evidence. Direct evidence is proof that a monopolist has exercised the power to control prices or exclude competition, such as by profitably charging supracompetitive prices or by degrading quality without losing business to rivals. Indirect evidence is proof that a monopolist holds a dominant share of a relevant antitrust market. Either form of evidence (direct or indirect) is independently sufficient to prove monopoly power, and here both point to the same conclusion: Expedia has monopoly power.

### *A. Direct Proof of Expedia's Monopoly Power*

42. Direct evidence demonstrates the exercise of monopoly power over both Listed Hotels and consumers. As to Listed Hotels, that evidence is principally the supracompetitive commissions Expedia extracts from hotels and its ability to impose and enforce its anticompetitive MFN Restraints that hotels cannot refuse despite their anticompetitive effects. As to consumers, it is Expedia's ability to force consumers who book through OTAs to pay artificially inflated prices. Expedia would not have the power to charge supracompetitive commissions or impose these anticompetitive restraints in either the Hotel OTA Channel or the Direct-Booked Channel absent its ability to exercise monopoly power.

43. Expedia's commission rate is supracompetitive and bears no relationship to the cost or value of the services Expedia OTAs provide. Expedia charges hotels a commission of approximately 15% of the total room price on every booking, and charges even higher rates—in some cases 25% to 30% or more—for hotels that purchase enhanced visibility or participate in Expedia's so-called preferred-placement programs.[12] A commission set as a percentage of the

---

[11] Smart Order, Expedia Ranking Tips for Hotels (May 12, 2026), https://www.smartorder.ai/resources/blog/expedia-ranking-tips-for-hotels/.

[12] Reported standard commission ranges for hotels listing on Expedia generally run from approximately 10% to 30% of the booking value, with higher rates associated with preferred-



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

room price does not track Expedia's cost of servicing the transaction: the incremental cost to Expedia of intermediating a $500-per-night reservation is no greater than the cost of intermediating a $150-per-night reservation, yet Expedia collects more than three times the commission on the former.

44. The service Expedia OTAs provide in exchange for their commission is limited. Expedia OTAs aggregate hotel information—names, locations, room types, photographs, amenities, and rates that the hotels themselves supply—into searchable interfaces, display that information to consumers, and route reservations to the hotel. Expedia OTAs operate on three models: the "merchant" model, the "agency" model, and the "advertising" model. On bookings made through Expedia's merchant model, Expedia collects the consumer's payment and conducts fraud screening,[13] but those are the same payment-and-risk functions that dedicated payment processors and card networks perform for a small fraction of Expedia's commission. The core listing-and-search functionality Expedia provides is available to hotels from numerous competing distribution vendors at a fraction of Expedia's commission, and is increasingly replicated by low-cost metasearch and direct-booking technologies. However, on bookings made through Expedia's agency model, the hotel charges the consumer's card directly and bears the payment-processing and fraud risk, while Expedia furnishes only the listing-and-referral function.[14] And on Expedia's advertising model, Expedia provides even fewer services: it sells

---

placement or enhanced-visibility programs. *See* Preno, How Much Commission Does Airbnb, Expedia and Booking.com Take (+ Others), https://prenohq.com/blog/ota-commission-rates-expedia-booking-com-more/.

[13] Expedia markets fraud-prevention and risk services to its partners and offers fraud-screening functionality through its OTAs. *See* Expedia Grp., *Preventing Phishing Attacks: Best Practices for the Travel Industry* (describing Expedia's "Fraud and Risk and Cyber Defense teams"); Expedia Grp. Developer Hub, *Fraud Prevention* (product documentation), https://developers.expediagroup.com. Expedia also identifies fraud risk as a business risk in its public filings. *See* Expedia Group, Inc., Annual Report (Form 10-K), Item 1A (Risk Factors) ("We are subject to fraud risks.").

[14] Expedia describes its principal business models in its public filings. Under the merchant model, Expedia is "the merchant of record" for the booking; under the agency model, Expedia "act[s] as the agent in the transaction, passing reservations booked by the traveler to the relevant travel provider" and "receive[s] commissions or ticketing fees." *See* Expedia Group, Inc., Annual Report FY2025 (Form 10-K) at 3-4 (describing the merchant, agency, and advertising models).



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

hotels paid placement and visibility across its transaction-based websites and its majority-owned metasearch site, Trivago, in exchange for a fee that buys only impressions and referral traffic, without even the reservation-routing function Expedia performs under the merchant and agency models.

45. The supracompetitive level of Expedia's commission is confirmed by comparison to the fees charged by payment-card networks, which perform a transactional-intermediation function that is as costly and risk-intensive as Expedia's. Payment networks operate global clearing and settlement infrastructure, extend credit, screen for and absorb fraud losses, advertise to consumers, and guarantee settlement to merchants. For these services they collect total merchant fees that averaged approximately 2.36% of the transaction across Visa and Mastercard in 2025, with interchange components generally ranging between roughly 1.5% and 3% of the purchase amount, and which a 2026 antitrust settlement caps at 1.25% for standard consumer credit cards.[15] Expedia's commission of approximately 15%, and substantially higher rates for hotels purchasing enhanced visibility, are several multiples of that figure. On the portion of its bookings for which Expedia acts as merchant of record—collecting the consumer's payment and conducting its own fraud screening—Expedia's commission already dwarfs the take rate of payment networks that perform the more capital- and risk-intensive components of that same payment function. And on the substantial share of its bookings made on an agency basis—where the hotel charges the consumer directly and bears the payment-processing and fraud risk—Expedia performs only a listing-and-referral service, yet still collects a supracompetitive

[15] A 2025 study found that the average effective merchant fee across Visa and Mastercard in 2025 was approximately 2.36% of the transaction, and interchange fees generally range between approximately 1.5% and 3% of the purchase amount. The Motley Fool, Average Credit Card Processing Fees and Costs in America (June 23, 2026), https://www.fool.com/money/research/average-credit-card-processing-fees-costs-america/. As part of a 2026 settlement of long-running merchant antitrust litigation against Visa and Mastercard, the card providers agreed to cap interchange fees at 1.25% for standard consumer credit cards for several years. *See* Mem. Decision & Or. at 9, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 1:05-md-01720 (E.D.N.Y. June 9, 2026), ECF No. 9884 (revised settlement granted preliminary approval Apr. 2026).



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

commission.[16] Neither the cost nor the value of the services Expedia provides explains a take rate many times that of a full-stack payment network.

46. That Expedia extracts commission at the same supracompetitive rate on bookings for which it performs no customer-discovery function is further direct evidence of its monopoly power. Through the practices known in the hotel industry as "parasitic bidding" and "brand hijacking," Expedia bids on Listed Hotel-branded keywords—the exact names of specific hotel properties—in paid-search advertising auctions, so that consumers searching for a specific hotel by name encounter Expedia's advertisements atop the search results, styled to mimic a direct link to the hotel, and click through in the mistaken belief they are booking with the hotel itself. These consumers arrive at Expedia already knowing which hotel they want; Expedia does not aggregate them, discover them for the hotel, or introduce them to that property. Yet on those parasitic-bidding bookings Expedia collects the same 15%-or-higher commission it collects on bookings for which it does perform a discovery function, notwithstanding that the "service" Expedia rendered was the interception of a booking already on its way to the hotel. In a competitive marketplace, hotels would refuse to pay a discovery-rate commission on bookings from consumers who arrived at Expedia already knowing which specific hotel they wished to book, and rival OTAs would compete on that basis; that Expedia collects those commissions notwithstanding is further evidence of its dominance.

47. Hotels recognize the disparity between OTA commission rates and the services they provide. At a 2016 earnings call, the Chief Executive Officer of Choice Hotels International, Inc. ("Choice"), a major hotel franchisor, publicly characterized OTAs as attempting to "suck 15% to 20% out of the deal," and stated that OTA pricing "overrated for what they provide."[17] The CEO continued, "we're not anti-OTA, but we're not at all happy with

---

[16]Gross bookings figures and the agency/merchant split are reported in Expedia Group, Inc.'s public filings. *See, e.g.,* Expedia Group, Inc., Annual Report FY2025 (Form 10-K) at 4 ("For the year ended December 31, 2025, we had total revenue of $14.7 billion, with merchant, agency and advertising, media and other accounting for 70%, 22%, and 8% of total revenue, respectively.").

[17] Choice Hotels Int'l, Q1 2016 Earnings Call (May 4, 2016) (Statement of Stephen P. Joyce, CEO).



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

some of their practices, and we've never been happy with their pricing."[18] Nonetheless, hotels are forced to use Expedia only because it is a "must have" distribution channel and has market power.

48. Likewise, in public financial disclosures, hotels recognize that they are beholden to OTAs and forced to pay their exorbitant commissions without recourse. A 2024 filing by Wyndham Hotels & Resorts, Inc. identifies "[t]hird-party internet travel intermediaries" as a "risk factor" that "may adversely affect" its business, stating that "[a]s the percentage of internet reservations increases, travel intermediaries may be able to obtain higher commissions and reduced room rates to the detriment of our business."[19] Likewise, a 2023 filing by Marriott states that "[a]n increase in the use of third-party Internet services to book online hotel reservations could adversely impact our business," specifically "through their fees, increasing the overall cost of Internet bookings for our hotels."[20]

49. Expedia's ability to withstand the loss of major hotel chains and force them back on its terms is direct evidence of its monopoly power. Hotel chains that have threatened to leave Expedia's OTAs, or which initially refused its terms, ultimately were forced by economic necessity to capitulate and return. For example, InterContinental Hotels Group ("IHG"), whose brands include Holiday Inn and Crowne Plaza, broke off its relationship with Expedia in 2004. IHG remained out of Expedia's systems for nearly four years. However, in 2007, it signed a multi-year agreement, returning all of its hotels to Expedia OTAs. Later, in 2009, Choice publicly accused Expedia of demanding "full control of our franchisees' room inventory and pricing, including last-room availability," an arrangement Choice said would have prevented its franchisees from holding back inventory to sell through its own channels.[21] When negotiations

[18] *Id.*
[19] Wyndham 10-K for FY2024, at 13, available at https://www.sec.gov/Archives/edgar/data/1722684/000172268425000005/wh-20241231.htm.
[20] Marriott 10-K for FY2023, at 12, available at https://www.sec.gov/Archives/edgar/data/1048286/000162828024004372/mar-20231231.htm.
[21] Jeri Clausing, *Expedia Pulls Choice Hotels*, Travel Weekly (Oct. 23, 2009), https://www.travelweekly.com/Travel-News/Online-Travel/Expedia-pulls-Choice-hotels.


TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

broke down, Expedia removed Choice's approximately 6,000 properties from Expedia-controlled websites, including Hotels.com. Despite its public complaints, Choice was forced by economic necessity to enter into a new three-year agreement with Expedia less than a month later, restoring its properties to the more than 80 websites Expedia operates. Industry observers uniformly understood the rapid capitulation by large hotel chains as a measure of Expedia's leverage and market dominance, with one concluding that Choice "clearly didn't have the clout to go toe to toe with Expedia" and "needed Expedia's distribution clout more than Expedia needed Choice Hotels' inventory."[22] Expedia's own CEO confirmed the asymmetry, telling analysts that the financial impact of dropping Choice was "minimal to none" because Expedia had recaptured the lost volume from other properties.[23]

50. Consumer dissatisfaction with Expedia is widespread, and Expedia's ability to maintain its dominance notwithstanding that dissatisfaction is itself direct evidence of its monopoly power. Complaint volumes and independent consumer-review ratings reflect systemic dissatisfaction with Expedia's OTAs, particularly with respect to opaque fees, restrictive refund and cancellation policies, and unresponsive customer service on booking disputes. If Expedia did not have monopoly power, consumers unhappy with Expedia would migrate to rival OTAs or to hotels' Direct-Booked Channels, and Expedia would face pressure to improve or lose sales; the persistence of Expedia's dominant position despite that discontent shows that no such competitive discipline is operating. That dynamic is reinforced by the widespread inability of consumers to identify Expedia as their counterparty in the first place. Through practices known in the hotel industry as "parasitic bidding" or "brand hijacking," Expedia bids on hotel-branded search terms and displays advertisements styled to resemble direct links to the hotel itself, so consumers searching for a specific hotel by name often click through and complete a booking in the mistaken belief they are dealing with the hotel. Consumers who do not recognize they are

---

[22] Dennis Schaal, *Choice Hotels-Expedia Agree to New Contract in Blink of an Eye*, PhocusWire (Nov. 12, 2009), https://www.phocuswire.com/Choice-Hotels-Expedia-agree-to-new-contract-in-blink-of-an-eye.

[23] *Id.*



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

transacting with Expedia have no means of taking their business elsewhere, no matter how poor their experience:




51. Expedia also exercises monopoly power over consumers who book through OTAs by forcing them to pay artificially inflated prices for hotel accommodations. The Challenged Conduct makes it more expensive for Listed Hotels to sell to consumers at lower prices through their Direct-Booked Channels: under the Contractual MFN, a hotel that discounts on its own website must extend the same discount to its Expedia bookings, and it risks demotion in Expedia's search results. Hotels therefore forgo those lower prices, and rates stay uniformly high across channels. If Expedia did not have monopoly power, consumers facing inflated prices on Expedia would shift to lower-priced rival OTAs, and Expedia would lose sales. That Expedia instead maintains its dominance while consumers pay inflated prices is direct evidence of its monopoly power.

52. Expedia's ability to carry out its Challenged Conduct demonstrates that Expedia represents a "must have" distribution channel. Absent Expedia's monopoly power, hotels would reject Expedia's anticompetitive Contractual MFN and Algorithmic MFN Restraints, which prevent hotels from offering lower prices through lower-cost channels. Expedia's ability to impose and enforce these anticompetitive contractual provisions without losing its dominance



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

reflects Expedia's substantial market power and hotels' dependence on access to Expedia's OTAs.

53. The hotel industry has told federal antitrust enforcers that hotels cannot resist Expedia's commission increases—further direct evidence of Expedia's power to control price. In August 2015, the American Hotel & Lodging Association, joined by more than two dozen state lodging associations and numerous hotel operators, wrote a letter to the U.S. Department of Justice describing Expedia's then-existing market position and the anticompetitive consequences of further consolidation with its then-proposed acquisition of Orbitz Worldwide. The signatories further represented that hotels relied on OTAs to distribute a substantial share of their room inventory and that they "must do business with these OTAs but will have virtually no leverage to resist any commission rate increase imposed by Expedia."[24] Industry participants warned that further consolidation would enable Expedia to "dictate commission rates and potentially raise rates" charged to hotels, and cited consumer survey data reflecting that those aware of the proposed acquisition "feared higher prices, loss of competition and a diminished quality of service."[25]

54. Absent Expedia's monopoly power, a hotel confronted with a 15% commission rate could and would compete it down to a lower level by steering price-sensitive consumers to a lower-commission Non-Expedia OTA or to its own commission-free Direct-Booked Channel. Non-Expedia OTAs would be incentivized to charge lower commission rates in order to attract hotel business. And absent the Challenged Conduct, hotels would be capable of selling their accommodations through lower-cost Non-Expedia OTAs. As a result, rival OTAs and hotels' own websites would gain sales at Expedia's expense, and the resulting loss of bookings would force Expedia's commission down to competitive levels. In short, Expedia's Challenged Conduct, described in Sections IV.C-D above, forecloses precisely that discipline. The

[24] "Lodging-Related Groups Send Letter to DOJ Opposing Expedia's Acquisition of Orbitz," Hotel Online (Aug. 11, 2015), https://www.hotel-online.com/news/lodging-related-groups-send-letter-to-doj-opposing-expedias-acquisition.

[25] *Id.*



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

persistence of a 15%-plus commission for a low-cost listing service is not a competitive outcome but the product of, and proof of, Expedia's monopoly power. Indeed, Expedia's ability to maintain its Contractual MFN and Algorithmic MFN Restraints in the face of multiple distribution alternatives confirms that those alternatives do not discipline Expedia. If a hotel's Direct-Booked Channel, Non-Expedia OTAs, hotel metasearch, or private accommodations were adequate substitutes, hotels could resist Expedia's MFN Restraints or shift volume away from Expedia. Expedia's ability to maintain those restraints is evidence of its monopoly power.

### *B. Indirect Proof of Expedia's Monopoly Power*

55. Indirect evidence establishes monopoly power through market structure: Expedia's high share of a relevant market.

#### 1. The Hotel OTA Market

56. The relevant product market for evaluating the Challenged Conduct is the market for OTA services for hotel accommodations connecting U.S. hotels with U.S. consumers (the "Hotel OTA Market"). This is a market in which OTAs provide intermediation services to two distinct groups: (a) hotels seeking distribution to reach consumers, and (b) consumers seeking to discover, compare, and book hotel accommodations.

57. OTAs are not reasonably interchangeable with a hotel's Direct-Booked Channel from the perspective of consumers. OTAs are intermediaries that aggregate inventory from multiple unaffiliated hotels. Consumers who use OTAs are seeking that specific intermediation function—one-time discovery and comparison across unaffiliated properties. A hotel's Direct-Booked Channel, by contrast, sells only the rooms of a single hotel or brand family. A Direct-Booked Channel cannot, as a functional matter, offer cross-property comparison across the competing lodging options in a given destination, because no single hotel can list its competitors' inventory on its own site. Direct-Booked Channels also often offer benefits unavailable through OTAs, such as hotel loyalty program points, direct communication with the property, and flexible cancellation policies. OTAs and Direct-Booked Channels therefore serve distinct consumer needs and use cases.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

58. Several practical indicia confirm that the Hotel OTA Market constitutes a distinct market:

a. The hotel and travel industry universally recognizes OTAs as a distinct distribution channel. Hotels, industry analysts, and trade publications consistently distinguish between OTA bookings and direct bookings, and track OTA market share as a separate metric. Expedia itself distinguishes its OTA services from its other travel services in its public filings and investor presentations.

b. OTAs possess unique characteristics that distinguish them from other hotel distribution channels. Only an OTA aggregates inventory from multiple, unaffiliated hotels into a single listing interface. No individual hotel's Direct-Booked Channel can replicate that function, because no individual hotel can list its competitors' inventory.

c. OTAs serve two distinct customer groups—hotels seeking consumer reach and consumers seeking hotel accommodations. Many OTA bookings constitute single transactions connecting a specific hotel and a specific consumer: the OTA cannot generate revenue from a hotel unless a consumer books through it, and cannot generate revenue from a consumer unless a hotel has listed inventory on it. The OTA's value to hotels increases with the number of consumers using it—more consumers mean more bookings and revenue, and hotels are correspondingly willing to pay higher commissions to OTAs with larger consumer audiences. The OTA's value to consumers likewise increases with the number and variety of hotels listed on it, because broader inventory enables comparison across more properties, locations, and price points in a single search. These indirect network effects between the two sides are a defining feature of the OTA distribution channel.

d. OTAs employ a commission-based pricing model in which the hotel pays a percentage of the consumer's booking value. This model differs fundamentally



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

from the economics of Direct-Booked Hotel Accommodations (no intermediary commission), offline travel agencies (fixed service fees), and advertising-based websites (cost-per-click or cost-per-impression). The commission structure creates distinct economic incentives and competitive dynamics.

e. The Hotel OTA Market is served by a small number of specialized websites principally OTAs operated by Expedia and Booking Holdings. No new entrant has emerged at scale in more than a decade, notwithstanding the size of the market and the persistence of supracompetitive commission rates. These websites offer a fundamentally different service that complements hotels' own distribution efforts.

59. That Expedia charges a supracompetitive commission rate for its OTA services, as explained above in Section V.A, is evidence that there is a relevant antitrust market for Hotel OTAs.

60. This District has recognized the distinction between hotel Direct-Booked Channels and the OTA channel in antitrust litigation involving Expedia. In *Office Cantonal des Faillites de la République et du Canton de Genève v. Expedia, Inc.*, 2024 WL 381181 (W.D. Wash. Feb. 1, 2024), Amoma SARL, a defunct Swiss OTA, alleged that it had been driven out of a similarly defined Hotel OTA market as a result of Expedia's anticompetitive conduct, including Expedia's Contractual MFN, as well as conduct Expedia directed through its majority-owned metasearch subsidiary Trivago. Amoma SARL asserted attempted monopolization claims against Expedia under Section 2 of the Sherman Act. Judge Rothstein denied Expedia's motion to dismiss the complaint, which complaint had proposed a relevant market of "the market for consumers booking hotels through online travel agencies," and thereby rejected Expedia's argument that the market should be expanded to include hotel Direct-Booked Channels and other means of booking hotel rooms. *Id.* at *8. The court held that the plaintiff had plausibly alleged that "booking through OTAs is not interchangeable with other methods of booking hotel rooms for purposes of market definition," pointing to allegations that OTAs offer



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

cross-brand loyalty programs and market themselves to consumers on the premise that consumers "will receive a better deal through the online travel agency than they would booking directly through the hotel." *Id.*

61. The Hotel OTA Market excludes private accommodations (such as Airbnb and Vrbo short-term rentals), flights, car rentals, and other non-hotel travel intermediation products. On the demand side, hotels and private accommodations are not reasonably interchangeable from the perspective of consumers: hotels offer standardized service, professional management, on-site amenities, and a consistent guest experience that private accommodations do not replicate. On the supply side, private accommodation OTAs do not compete for the same hotel inventory and do not offer the same intermediation services to hotel operators.

62. The market also excludes travel metasearch platforms such as Google Hotels, Expedia's Trivago product, Kayak, and TripAdvisor. Metasearch platforms are not reasonably interchangeable with OTAs from the perspective of consumers seeking to book hotel accommodations. Consumers generally cannot book a hotel room on a metasearch platform. Rather, metasearch platforms aggregate and display rates sourced from OTAs and hotel direct channels, but the completed booking for the vast majority of transactions occurs on the platform to which the consumer is referred—an OTA or the hotel's Direct-Booked Channel—where the consumer submits payment, receives a confirmation, and obtains cancellation rights, customer service, and any applicable loyalty benefits. Metasearch platforms do not hold inventory, generally do not process payment, and are typically not the merchant of record. They function principally as advertising and referral services, monetized through cost-per-click and cost-per-acquisition referral payments from the OTAs and hotels whose listings they display. Metasearch is therefore complementary to, and not a substitute for, the OTA channel and Direct-Booked Channel: a consumer's booking journey routinely begins on a metasearch platform and terminates in a transaction on an OTA or hotel Direct-Booked Channel.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**2. The Geographic Market is the United States and Its Territories**

63. The relevant geographic market for Hotel OTA websites for purposes of analyzing the Challenged Conduct is the United States and its territories.

64. OTA websites compete throughout the United States because they each seek to build a nationwide network of consumers to offer hotel accommodations, and a nationwide network of hotels to offer to consumers. Non-Expedia OTAs such as Booking.com likewise operate nationally, competing with Expedia for the same nationwide pool of hotels and consumers. Because OTAs compete to assemble a nationwide network of hotel inventory on one side of the website and a nationwide base of consumers on the other, the conditions of competition are common across the United States, and the relevant geographic market for OTA services is national in scope.

65. Expedia markets its OTAs to consumers nationally through national advertising campaigns and a single consumer-facing brand, and it solicits hotel inventory nationwide through a uniform partner-onboarding process. Consumers, in turn, use Expedia interchangeably to book travel across the country, often booking accommodations in states other than their own. Each of Expedia's OTAs is maintained in a single, unified format accessible to consumers throughout the United States, on which a consumer in any state can search, compare, and book accommodations at hotels located anywhere in the country. Expedia does not segment its OTAs, its pricing, or its commission structure by region or locality. Indeed, the same Challenged Conduct—the Contractual MFN and the Algorithmic MFN Restraints—applies uniformly to hotel pricing across the United States.

66. The relevant geographic market excludes bookings on Hotel OTA websites made for hotel accommodations located outside the United States. From the perspective of a U.S. hotel purchaser, domestic and international travel are not reasonably interchangeable. Trip destinations are typically fixed before hotel booking on the basis of trip purpose—visiting family, attending a wedding, funeral, or reunion, business travel, medical appointments, or a specific vacation destination—and a marginal commission-driven increase in U.S. hotel rates would not cause a



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

consumer to substitute a foreign destination for the destination the trip requires. Even where the travel purpose is discretionary leisure, international travel imposes categorically different burdens on U.S. consumers: it requires a valid U.S. passport, which a substantial share of U.S. adults do not possess; it may require a visa depending on the destination; it entails materially longer travel times and substantially higher airfare costs; and it involves language, cultural, and logistical friction absent from domestic travel. International travel also implicates health and safety considerations that domestic travel does not: U.S. health insurance often provides limited or no coverage for care received abroad (Medicare, for example, provides no coverage outside the United States), U.S. consumers have reduced access to familiar healthcare providers and standards, and certain destinations present destination-specific safety and health risks. Because U.S. consumers cannot practicably substitute international travel for domestic travel in response to a small but significant non-transitory increase in the price of U.S. hotel rooms, foreign accommodations booked through Hotel OTAs are not part of the relevant geographic market.

### 3. Expedia's Monopoly Power in the Hotel OTA Market

67. Expedia's high market share demonstrates its monopoly power in the Hotel OTA Market. Expedia holds 78% of the Hotel OTA Market (measured in gross booking value in dollars), with the next biggest OTA, Booking.com, making up only 18% of the Market, and all other remaining OTAs making up 4% of the Market:



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Figure 1: Hotel OTA Market Shares, US (2024)




Source: PhocusWright and 10-K statements of Expedia and Booking.com

68. In materials submitted in connection with the proposed Choice–Wyndham hotel-franchising combination, Choice Hotels depicted Expedia as holding approximately 70% of U.S. OTA bookings—with Booking.com at approximately 20% and all other OTAs comprising the remaining 10%—and described Expedia and Booking as "the real gatekeepers, wielding market power over hotels and guests."[26]

69. These market shares reflect a highly concentrated Hotel OTA Market. The Herfindahl-Hirschman Index ("HHI") is a standard measure of market concentration that the U.S. Department of Justice and Federal Trade Commission use to analyze market concentration under their Horizontal Merger Guidelines. These agencies classify any market with an HHI above 2,500 as highly concentrated. A July 2017 white paper by Professor Benjamin Edelman of the Harvard Business School, commissioned by the American Hotel & Lodging Association,

[26] Choice Hotels Int'l, Inc., *Investor Presentation: Choice and Wyndham – A Pro-Competitive Combination*, at 17 (Jan. 10, 2024).



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

calculated an HHI for the U.S. Hotel OTA Market of 5,069—more than twice the 2,500 threshold.[27]

70. Nearly every hotel in the U.S. that utilizes OTAs lists accommodations on an Expedia OTA. Because Expedia accounts for 78% of the Hotel OTA Market (measured in gross booking value), Expedia is a "must have" OTA for U.S.-based hotels. This means that Expedia also dominates among consumers: of every dollar U.S. consumers spend booking hotels through OTAs, approximately 78 cents is booked through Expedia OTAs. It is not financially viable for a U.S.-based hotel to forgo listing accommodations on Expedia.

71. Expedia touts the scale of its OTAs in its own marketing to hotels: Expedia represents that its OTAs generate more than one billion searches per month and facilitated the booking of approximately 300 million net room nights in a single recent year.

72. In addition to its dominant share of the Hotel OTA Market, Expedia's monopoly power is protected by significant barriers to entry and expansion:

a. Expedia's monopoly power is reinforced by indirect network effects. The more consumers use Expedia to search for and book accommodations, the more important Expedia becomes to hotels seeking access to those consumers. All things equal, the more hotels list inventory on Expedia, the more important Expedia becomes to consumers as a search and comparison platform. These reinforcing effects make it difficult for Non-Expedia OTAs or new entrants to displace Expedia absent the ability to undercut its commission rate (which the Challenged Conduct blocks). By contrast, a new OTA must attract both a substantial base of consumers and a substantial inventory of hotels. Without consumers, hotels have little reason to list; without hotel inventory, consumers have little reason to use the inchoate OTA. These indirect network effects, combined with brand recognition, consumer data, loyalty programs, advertising

[27] Edelman, Benjamin, *Impact of OTA Bias and Consolidation on Consumers* (July 12, 2017), at 9.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

scale, and established hotel relationships, make entry into the Hotel OTA Market difficult.

b. As explained further *infra* in Section VII, Expedia's Challenged Conduct is itself the single biggest barrier to entry and expansion. By preventing hotels from offering lower prices on Non-Expedia OTAs or Direct-Booked Channels through its Challenged Conduct, Expedia denies rivals and entrants the most obvious competitive tool for attracting consumers: lower prices. This makes Non-Expedia OTAs less attractive to consumers and less valuable to hotels, preserving Expedia's market dominance and ability to artificially inflate its commissions.

73. U.S. hotels cannot practicably avoid listing on Expedia if they wish to reach a commercially meaningful segment of U.S. hotel-booking consumers. Expedia aggregates a uniquely large pool of U.S. consumer hotel-booking demand, and hotels therefore depend on Expedia as a critical distribution channel. A recent report suggests that OTAs like Expedia account for 65% of U.S. hotel reservations by volume.[28] Expedia itself recognizes that U.S. hotels depend on it for a critical share of sales to customers that prefer making bookings through OTAs. Expedia represents that hotels list with it to obtain access to guests "in locations and at volumes that would be difficult to reach through independent marketing efforts," and that hotels lack the marketing budget and resources to drive comparable demand on their own. Thus, given the volume and importance of the consumer booking demand Expedia has aggregated, hotels cannot forgo listing on Expedia without sacrificing a critical share of their bookings, and Expedia's control over that demand accordingly gives it the leverage to compel hotels to accept the restrictive terms it imposes as a condition of listing, including the Challenged Conduct.

74. Expedia's dominant position in the Hotel OTA Market makes it a "must have" distribution channel for hotels. Simply put, it is not financially viable for hotels to forgo listing accommodations on Expedia. Expedia serves as a necessary gateway to customers for hotels, and

[28] Mews, What the US hotel data from 2026 is telling you (June 22, 2026), https://www.mews.com/en/blog/us-hotel-performance-2026-what-the-data-says.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

hotels cannot afford to decline contracting with Expedia, despite Expedia's use of the anticompetitive Contractual MFN and Algorithmic MFN Restraints.

## VI. ANTICOMPETITIVE CONDUCT & HARM TO COMPETITION

75. Expedia's Challenged Conduct substantially restrains competition and inflates prices across all hotel distribution channels—including both Non-Expedia OTAs and Direct-Booked Channels.

76. ***First***, Expedia's Challenged Conduct insulates its own OTA commission rates from competitive pressure, allowing Expedia to charge and maintain commissions above the levels that would prevail in a competitive market. In a competitive market absent the Challenged Conduct, a hotel faced with Expedia's inflated commission could respond by offering lower prices on lower-cost channels—Non-Expedia OTAs (which would be incentivized to use lower commissions as a means to attract both hotel and consumer business) or its own Direct-Booked Channel—thereby steering hotels and consumers away from Expedia and forcing Expedia to lower its commission to retain bookings. Expedia's Challenged Conduct eliminates that disciplining mechanism by prohibiting hotels from undercutting Expedia's rates anywhere.

77. Freed from the competitive constraint that discounting on other channels as a means of gaining business from hotels and consumers would otherwise impose, the Challenged Conduct facilitates Expedia's maintenance of artificially inflated commission rates of approximately 15% or higher. Expedia's commission rate is untethered from the cost or value of the service Expedia provides and several times the take rate charged by full-stack payment networks for a more risk-intensive function. *See supra* § V.A. Absent the Challenged Conduct, Expedia's commissions would be significantly lower, because hotels—freed to offer lower prices on their Direct-Booked Channels—would exert competitive pressure on Expedia to reduce commissions in order to retain hotel supply, and rival OTAs would compete more aggressively on commission rates to attract that supply.

78. ***Second***, Expedia's Challenged Conduct prohibits hotels from offering lower prices through their Direct-Booked Channels, eliminating further price competition from hotels



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

directly. Because Expedia's monopoly power in the Hotel OTA Market allows it to impose and enforce its Contractual MFN, Expedia effectively sets a floor under the prices Listed Hotels charge in their Direct-Booked Channels—and the harm this inflicts on direct-booking consumers is inextricably intertwined with Expedia's conduct in the Hotel OTA Market. This restriction on hotel Direct-Booked Channels is the very mechanism by which Expedia enforces its supracompetitive OTA commissions: it neutralizes the key threat to those commissions—hotels steering consumers to book direct. Absent Expedia's Challenged Conduct, hotels would offer meaningful discounts on their Direct-Booked Channel, because such bookings avoid OTA commissions entirely. The overcharge borne by direct-booking consumers and by consumers on non-Expedia OTAs is the means by which Expedia suppresses competition in the Hotel OTA Market.

79. Because of Expedia's Challenged Conduct, hotels cannot offer direct-booking discounts that undercut Expedia prices without violating the Contractual MFN and thereby risking contractual consequences and visibility penalties. If U.S. hotels could discount prices on their Direct-Booked Channels to generate more business on those channels, they would. Indeed, the CEO of Choice Hotels described one of his company's "missions" as "limit[ing] the amount of activity going from the OTAs" to "our proprietary channels," because those channels are "dramatically more profitable than an OTA."[29] The executive observed that "everybody else is doing the same thing" across the industry.[30]

80. Thus, consumers who book through Direct-Booked Channels are forced to pay rates artificially inflated by the Challenged Conduct—even though no OTA commission is actually incurred on those transactions.

81. ***Third***, Expedia's Challenged Conduct eliminates price competition in the Hotel OTA Market in the form of lower commissions, a key mechanism by which Non-Expedia OTAs could compete with Expedia. Without Expedia's Challenged Conduct, a Non-Expedia OTA

[29] Choice Hotels Int'l, Q1 2016 Earnings Call (May 4, 2016) (Statement of Stephen P. Joyce, CEO).
[30] *Id.*



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

could and would attract hotels and consumers by charging a lower commission rate than Expedia charges. Those hotels would be incentivized to reduce their room rates on the now lower-commission Non-Expedia OTAs because sales on the now lower-commission OTAs would be at lower cost to the hotels, and thus more profitable. Consumers would, in turn, gravitate away from Expedia toward the lower-priced Non-Expedia OTAs, rewarding them for their lower fees.

82. Expedia's Challenged Conduct short-circuits this competitive dynamic. Even if a Non-Expedia OTA cuts its commission rate, a hotel subject to Expedia's Challenged Conduct could not offer a lower price on that Non-Expedia OTA without risking demotion in Expedia's search rankings, loss of VIP Access eligibility, or other adverse consequences. The Challenged Conduct thus eliminates hotels' incentives to offer lower prices on lower-commission Non-Expedia OTAs, and, in turn, eliminates Non-Expedia OTAs' incentive to compete on commission: so long as the Challenged Conduct is in place, a lower commission rate will not yield a lower hotel price, and therefore will not attract additional consumers.

83. In short, Expedia's Challenged Conduct causes commission rates at Non-Expedia OTAs to be artificially inflated and thereby harms consumers who book through Non-Expedia OTAs by forcing them to pay artificially inflated prices for accommodations. The inflated rates offered by Non-Expedia OTAs as a result of Expedia's Challenged Conduct are an integral and inextricable part of Expedia's anticompetitive scheme.

84. Additionally, Expedia's Challenged Conduct raises artificial barriers to entry and expansion in the Hotel OTA Market by denying actual and potential rivals the most effective tool for gaining market share: the ability to offer consumers lower hotel prices by charging hotels lower commissions. In a competitive market, a new or expanding OTA could attract hotel inventory by offering a lower commission rate, thus enabling hotels to offer accommodations at lower prices on Non-Expedia OTAs. This combination—lower commissions paired with lower consumer prices—is the principal means by which a competitor overcomes the network-effects advantages of an incumbent. Expedia's Challenged Conduct forecloses that path. Because hotels bound to price parity by Expedia's Challenged Conduct cannot offer lower prices on a Non-



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Expedia OTA without risking unfavorable placement in Expedia's search rankings due to Expedia's Algorithmic MFN Restraints, a lower-commission entrant cannot translate its commission advantage into the lower consumer prices that would draw bookings to its website. The Non-Expedia OTA is thus deprived of the ability to compete on price, on which it could and would otherwise challenge Expedia, entrenching Expedia's dominant position and deterring entry and expansion that would benefit consumers.

85. Expedia has substantially foreclosed competition in the Hotel OTA Market. As set forth above, Expedia intermediates approximately 78% of gross U.S. hotel OTA bookings in dollars; its Contractual MFN binds every Listed Hotel; and its Algorithmic MFN Restraints reach every rate a Listed Hotel posts on every competing channel. The Challenged Conduct thus forecloses a principal mechanism through which competition would otherwise discipline OTA commissions: price competition that would otherwise erode Expedia's commissions and attract entrant OTAs offering to compete on those commissions. That foreclosure of the competitive process occurs across substantially the entire Hotel OTA Market for Listed Hotels.

## VII. ANTICOMPETITIVE EFFECTS

86. The harm to competition described above produces cognizable anticompetitive effects across both sides of the Hotel OTA Market (both consumers and hotels) as well as in the hotel Direct-Booked Channel. By neutralizing price as a basis for competition among OTAs, Expedia's Challenged Conduct impairs competition among OTAs on other dimensions, including service quality, booking functionality, and the development of more efficient, lower-cost distribution methods. Competition on these dimensions is ordinarily reinforced by price competition: a platform that cannot be disciplined by the loss of price-sensitive consumers to a lower-priced rival faces weaker pressure to differentiate or pursue more efficient methods of distribution to consumers. To the extent Expedia's Challenged Conduct severs the link between lower distribution costs and lower consumer prices, it correspondingly reduces the incentive for rivals and entrants to compete by offering improved or lower-cost distribution alternatives,



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

depriving consumers of benefits that fuller competition among OTAs would be expected to produce.

87. Rather, the absence of competitive discipline has enabled Expedia to maintain consumer-facing business practices that a competitively constrained OTA would be forced to abandon or reform. Those practices similarly turn on the withholding or obscuring of information consumers would rely on to make different choices: (a) opaque, drip-disclosed fees not surfaced until late in the booking process, after the consumer has committed time to the transaction; (b) restrictive change and refund policies, including "non-refundable" rate offerings that Expedia declines to modify even in circumstances where the underlying hotel itself would have accommodated the guest directly; (c) delayed, scripted, and often unresponsive customer-service handling of booking disputes; and (d) limited remediation when a booking goes wrong on Expedia's platform. These are the predictable consequences of a market in which the dominant OTA has been shielded from competition on both price and quality: because rival OTAs cannot compete for hotels and consumers by offering lower prices (foreclosed by the Challenged Conduct), they likewise face weakened incentives to compete on the non-price dimensions of service, transparency, and remediation—and Expedia, insulated from that competition, has no incentive to improve. Absent the Challenged Conduct, consumers would discipline these practices by shifting to rival OTAs; Non-Expedia OTAs would compete on service, transparency, and remediation to attract that traffic; and Expedia would be forced to improve or lose share. The Challenged Conduct forecloses that competitive discipline and preserves practices that harm consumers.

88. Expedia's Challenged Conduct thus raises prices across both sides of the Hotel OTA Market. On the hotel side, the restraints insulate Expedia's supracompetitive commissions from competitive discipline. On the consumer side, those same supracompetitive commissions are embedded into the room prices consumers pay on Non-Expedia OTAs. Expedia's Challenged Conduct also forces hotels to maintain those same inflated prices on their Direct-Booked Channels. The effect across both sides of Expedia's OTAs is to suppress price competition



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

among OTAs, foreclose rival and entrant OTAs from competing on commission, entrench Expedia's dominance, and artificially inflate prices paid by consumers on rival OTAs and Direct-Booked Channels.

89. The effect of Expedia's Challenged Conduct is widely observable in the marketplace. The same hotel rooms, for the same dates, are frequently offered at the same prices across Expedia, rival OTAs, and the Direct-Booked Channels. The table below illustrates this uniformity for the Tampa Marriott Water Street, Hyatt Regency Chicago, Homewood Suites by Hilton Austin Downtown, The Westin Tempe, Hampton Inn Cleveland Airport-Tiedman Rd, and Hyatt House Orlando Airport, showing identical or near-identical rates for the same room and date across Expedia OTAs, Non-Expedia OTAs, and the hotel's Direct-Booked Channel. The price uniformity across the channels depicted below reflects the suppression of cross-channel price competition alleged herein:






TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

| Hotel | Room Type | Booking Dates | Expedia Nightly Price | Booking.com Nightly Price | Direct Nightly Price |
|---|---|---|---|---|---|
| Tampa Marriott Water Street | 2 Queen Beds - free cancellation | November 5 – November 7, 2026 | $449.14 | $449.41 | $449.14 |
| Hyatt Regency Chicago | 1 Queen Bed - non-refundable | February 17 – February 20, 2027 | $288.10 | $288.14 | $288.12 |
| Homewood Suites by Hilton Austin Downtown | 1 King Room - non-refundable | March 4 – March 6, 2027 | $194.74 | $194.74 | $194.74 |
| The Westin Tempe | Traditional, Guest room, 1 King - non-refundable | October 28 – October 31, 2026 | $325.12 | $330.04 | $330.04 |
| Hampton Inn Cleveland Airport-Tiedman Rd | 2 Queen Beds - non-refundable | March 10 – March 13, 2027 | $153.23 | $153.23 | $153.23 |
| Hyatt House Orlando Airport | 1 King Bed - non-refundable | June 24 – June 27, 2027 | $305.25 | $305.25 | $305.25 |

90. Expedia may assert that its Challenged Conduct serves legitimate procompetitive purposes, but no such legitimate purposes exist, the challenged restraints would not be reasonably necessary to achieve any such purposes if they did, and any objective Expedia identifies can be achieved through less restrictive means.

a. MFN Clauses are not necessary to operate an OTA. In *Booking.com BV v. 25hours Hotel Co. Berlin GmbH*, the Court of Justice of the European Union held that such clauses are neither objectively necessary nor proportionate to the



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

operation of an OTA. OTAs that abandoned such clauses in jurisdictions where they were prohibited have continued to operate.

b. The Challenged Conduct does not lower the prices consumers see; it raises them, embedding Expedia's commission in the rates hotels post across every channel and foreclosing the lower prices that would otherwise appear on Non-Expedia OTAs and Direct-Booked Channels. Eliminating the Challenged Conduct would intensify price competition on both sides of the Hotel OTA Market rather than withdraw any benefit.

c. Absent the Challenged Conduct, Expedia could and would compete for hotels and consumers on the merits—through its commission rates, search functionality, marketing, and service—without prohibiting hotels from offering lower prices on competing channels, as the continued operation of OTAs in jurisdictions that prohibited MFN Clauses confirms.

91. In any event, the anticompetitive effects of Expedia's Challenged Conduct—higher commissions, higher consumer prices across channels, foreclosure of rival OTAs, and heightened barriers to entry—substantially outweigh any procompetitive benefit Expedia's restraints could plausibly produce.

## VIII. ANTITRUST INJURY

92. Plaintiffs and members of the Classes have suffered antitrust injury in the form of paying artificially inflated prices for accommodations at Listed Hotels, *i.e.*, injury of the type the antitrust laws were intended to prevent and that flows from Expedia's Challenged Conduct.

93. Throughout the Class Period, Direct-Booked Class members, as defined herein, directly purchased accommodations from Listed Hotels. Direct-Booked Class members are injured because, as a means of insulating Expedia from competition, Expedia's Challenged Conduct prevents Listed Hotels from offering lower prices through their Direct-Booked Channels. Absent Expedia's Challenged Conduct, Listed Hotels would charge less for Direct-Booked Hotel Accommodations because it costs them less to sell through their Direct-Booked



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Channels (which carry no OTA commission), and Plaintiff Rocci and all similarly situated Direct-Booked Class members would have paid much less for their accommodations. The artificial inflation of the price of directly purchased accommodations from Listed Hotels in the Direct-Booked Channel is a necessary means to achieve the anticompetitive ends of Expedia's Scheme, and is a direct result of Expedia's Challenged Conduct. Thus, Expedia has caused antitrust injury to Direct-Booked Class members in the form of causing all class members to pay, and continue to pay, overcharges on prices for accommodations from Listed Hotels. The full amount of such overcharge damages will be calculated after discovery and upon proof at trial. Unless Expedia's Challenged Conduct is stopped, the members of the Direct-Booked Class will continue to incur overcharges in their direct purchases of accommodations indefinitely.

94. Through the Challenged Conduct, including the Contractual MFN, which prohibits Listed Hotels from charging lower prices in Direct-Booked Channels, Expedia causes Direct-Booked Class members to pay artificially inflated prices for their accommodations. Direct-Booked Class members are the most direct victims of this restraint, and their harm is also necessary to the Challenged Conduct's success in enhancing Expedia's dominance and harming competition in the Hotel OTA Market.

95. Specifically, the Contractual MFN enables Expedia to charge supracompetitive commissions to Listed Hotels in the Hotel OTA Market because it prevents those hotels from driving booking volume away from Expedia through lower prices in Direct-Booked Channels. Absent the Contractual MFN, a Listed Hotel would respond to an increase in Expedia's commissions by increasing its prices on Expedia, while maintaining lower prices in Direct-Booked Channels. Consumers would then book more through the Listed Hotel's Direct-Booked Channels, which would reduce the profitability of Expedia's artificially inflated commissions and thereby force Expedia to lower its commissions, which, in turn, would cause consumers in both Classes to pay less for hotel accommodations.

96. With the Contractual MFN, however, a Listed Hotel cannot charge different prices across channels; instead, it must spread the increased commissions across both Expedia



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

and Direct-Booked Channels. As a result, Listed Hotels respond to the artificial inflation of Expedia's commissions caused by the Challenged Conduct by increasing prices both on Expedia and in Direct-Booked Channels. Because Listed Hotels do not and cannot reduce their prices in Direct-Booked Channels relative to their prices on Expedia, consumers do not shift volume to the hotel's Direct-Booked Channels, and Expedia's artificially inflated commission levels are therefore sustained.

97. Preventing members of the Direct-Booked Class from enjoying lower prices in Direct-Booked Channels is thus the very means by which the Contractual MFN produces anticompetitive effects in the Hotel OTA Market. If the Contractual MFN did not prevent Direct-Booked Class members from enjoying lower prices, it would not reduce their incentive to book through the Direct-Booked Channels and would make artificially inflated commissions unprofitable for Expedia. Expedia thus uses Direct-Booked Class members as a fulcrum: it imposes additional costs on them to eliminate their incentive to shift to a lower-price channel, allowing Expedia to profitably maintain higher commissions than it otherwise could. Accordingly, the injury suffered by Direct-Booked Class members is inextricably intertwined with the anticompetitive harm that Expedia sought to inflict on competition in the Hotel OTA Market.

98. The Challenged Conduct harms OTA Class members because it artificially inflates hotel accommodation prices that consumers pay when booking through Non-Expedia OTAs. Absent Expedia's Challenged Conduct, Non-Expedia OTAs would charge lower commissions, hotels would charge less for accommodations listed on Non-Expedia OTAs because it would cost less to sell there, and Plaintiffs Andrews and Hoi and the OTA Class members would have paid less for the hotel accommodations they booked on Non-Expedia OTAs. The artificial inflation of the price of accommodations booked through Non-Expedia OTAs is a necessary means to achieve the goals and ends of Expedia's anticompetitive Scheme, and is a direct and foreseeable result of Expedia's Challenged Conduct. Expedia has therefore caused OTA Class members antitrust injury in the form of causing all of them to pay, and



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

continue to pay, artificially inflated prices for hotel accommodations. The full amount of overcharge damages will be calculated after discovery and upon proof at trial. Unless Expedia's Challenged Conduct is stopped, members of the OTA Class will continue to incur overcharges in their purchases of hotel accommodations on Non-Expedia OTAs.

99. Plaintiffs and members of both Classes are not making any claims against Expedia arising out of any products or services they may have purchased from or through Expedia.

## IX. CLASS ACTION ALLEGATIONS

100. Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of themselves and the following Classes:

101. **Direct-Booked Class:** All persons and entities in the United States who, during the period from October 2, 2022, through the date the Challenged Conduct ceases (the "Class Period"), directly purchased a U.S. hotel accommodation from a Listed Hotel through the Listed Hotel's Direct-Booked Channel.

102. **OTA Class:** All persons and entities in the United States who, during the Class Period, purchased a U.S. hotel accommodation at a Listed Hotel by making the reservation for the hotel accommodation through a Non-Expedia OTA and paying for the accommodation either directly to the hotel or directly to the Non-Expedia OTA.

103. Excluded from the Classes are Expedia, its officers, directors, management, employees, subsidiaries, and affiliates; Expedia's parents, subsidiaries, and affiliates; any co-conspirators; any federal, state, or local governmental entity; and any judges or justices assigned to hear any aspect of this action.

104. Expedia imposes its uniform Contractual MFN clause in its standard Hotel Agreement with U.S. hotels and maintains its Algorithmic MFN Restraints that, together, suppress lower prices on rival OTAs and on Direct-Booked Channels. Because the resulting overcharge flows from Expedia's Challenged Conduct, the existence and amount of the



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

overcharge can be established and measured on a classwide basis through common evidence and common methodologies.

105. Each of the Classes is so numerous that joinder of all members in this action is impracticable. There are likely millions of members in both the OTA and Direct-Booked Classes. The precise number and identity of members of each Class is not currently known to Plaintiffs but is ascertainable from booking and transaction records, including those maintained by Non-Expedia OTAs and Listed Hotels.

106. The claims of Plaintiffs are typical of those of the Classes they seek to represent because Plaintiffs press the same legal theories, and seek to redress the same injury, for themselves as for all members of the Classes. Plaintiffs and all members of the Classes they seek to represent were injured by the same unlawful conduct, which resulted in all of them paying more for U.S. accommodations than they otherwise would have absent the Challenged Conduct.

107. Plaintiffs and their counsel will adequately represent the Classes they seek to represent because Plaintiffs' interests are aligned with, and not antagonistic to, those of the Class each seeks to represent, respectively; and Plaintiffs are represented by counsel who are experienced in the prosecution of complex antitrust class actions.

108. Questions of law and fact common to the members of each of the Classes will predominate over questions, if any, that may be specific to individual members, because Expedia has acted and refused to act on grounds generally applicable to the Classes. Questions of law and fact common to the Classes include, but are not limited to:

a. whether Expedia possesses monopoly power;

b. whether the Hotel OTA Market is a relevant antitrust market;

c. whether Expedia's Challenged Conduct amounts to an unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

d. whether Expedia unlawfully acquired or maintained monopoly power in violation of Section 2 of the Sherman Act;



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

e. whether Expedia's Challenged Conduct had the effect of suppressing price competition across Non-Expedia OTAs and inflating prices on accommodations through Direct-Booked Channels and on Non-Expedia OTAs;

f. whether Expedia's Challenged Conduct lacks any legitimate procompetitive justification that could be achieved through less restrictive means, and whether any such procompetitive justifications are outweighed by anticompetitive effects; and

g. the appropriate remedies and measure of damages incurred by the Classes.

109. Class action treatment is the superior method for the fair and efficient adjudication of this controversy because, among other reasons, it will permit a large number of similarly situated people or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action. The claims of both Classes raise no unique manageability concerns, as they arise from the same conduct, the same restraints, and the same market-wide pricing structure.

## X. CAUSES OF ACTION

### *A. COUNT I - Violation of Section 1 of the Sherman Act Unreasonable Restraint of Trade (15 U.S.C. § 1)*

110. Plaintiffs incorporate by reference all preceding paragraphs as though set forth fully herein.

111. Expedia entered into contracts, combinations, or agreements with Listed Hotels in the form of Hotel Agreements that impose Expedia's Challenged Conduct, *i.e.*, containing its Contractual MFN clause and subjecting the hotel to Expedia's Algorithmic MFN Restraints.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

These agreements constitute contracts, combinations, or conspiracies in restraint of trade within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

112. The agreements between Expedia and U.S. hotels unreasonably restrain trade under the rule of reason. Hotels enter into these agreements, and accept the Contractual MFN and Algorithmic MFN Restraints, only because Expedia's dominance of the Hotel OTA Market leaves them no commercially viable alternative distribution channel through which to reach a comparable share of critically and economically necessary online hotel-booking consumers.

113. To the extent required, the relevant market is the Hotel OTA Market, as defined above.

114. To the extent required, the relevant geographic market is the United States and its territories.

115. Expedia possesses monopoly power in the Hotel OTA Market, over both hotels and consumers, sufficient to impose and enforce its Challenged Conduct on U.S. hotels, to charge artificially inflated commissions, and cause consumers to pay artificially inflated prices in the Direct-Booked and Non-Expedia OTA channels. Through the Challenged Conduct, Expedia unreasonably restrains trade by prohibiting hotels from offering lower prices on rival OTAs or through their Direct-Booked Channels, foreclosing rival OTAs from competing on commissions, and eliminating the cross-channel price competition that would otherwise discipline Expedia's supracompetitive commissions.

116. Expedia's Challenged Conduct has caused substantial anticompetitive effects in the Hotel OTA Market and the Direct-Booked Channel, including: (a) inflating Expedia's commission rates; (b) inflating rival OTA commission rates; (c) inflating consumer prices on rival OTAs and Direct-Booked Channels; (d) raising barriers to entry; and (e) reducing output, quality, and innovation in OTA services.

117. Any procompetitive benefits allegedly associated with Expedia's Challenged Conduct do not outweigh the substantial harm to competition and consumers, and could be achieved through less restrictive alternatives.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

118. But for Expedia's unlawful actions, members of the Direct-Booked Class would have paid lower prices for their accommodations booked through Direct-Booked Channels; and members of the OTA Class would have benefited from price competition among OTAs and would have paid lower prices for accommodations booked through Non-Expedia OTAs.

119. As a direct and proximate result of Expedia's Challenged Conduct, Plaintiffs and the Classes have paid overcharges and, therefore, suffered antitrust injury. Plaintiffs and the Classes are thus entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.

### *B. COUNT II - Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)*

120. Plaintiffs incorporate by reference all preceding paragraphs as though set forth fully herein.

121. To the extent legally necessary, the relevant product market is the Hotel OTA Market, as defined above.

122. To the extent legally necessary, the relevant geographic market is the United States and its territories.

123. At all times throughout the Class Period, Expedia possessed monopoly power in the Hotel OTA Market, over both hotels and consumers.

124. Expedia has willfully acquired and maintained its monopoly power through its Challenged Conduct, *i.e.*, the imposition of its Contractual MFN clauses and Algorithmic MFN Restraints. This conduct excludes and/or impairs actual and potential competitors by preventing rival OTAs from competing on price (*i.e.*, commission rates) and preventing hotels from steering consumers to lower-cost Direct-Booked Channels. Expedia's MFN Restraints do not reflect competition on the merits. Rather, they are the exercise of monopoly power to foreclose competitive entry and preserve Expedia's monopoly power, dominance, and supracompetitive commissions.

125. Through the above-referenced conduct, Expedia has acted with an intent to illegally maintain its monopoly power over the Hotel OTA Market, and its conduct has enabled it to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

126. At all material times, Expedia's Challenged Conduct and the affected hotel-booking transactions have had a substantial effect on interstate commerce.

127. Expedia's Challenged Conduct has caused substantial anticompetitive effects in the Hotel OTA Market and the Direct-Booked Channel, including: (a) inflating Expedia's commission rates; (b) inflating rival OTA commission rates; (c) inflating consumer prices on rival OTAs and Direct-Booked Channels; (d) raising barriers to entry; and (e) reducing output, quality, and innovation in OTA services.

128. Any procompetitive benefits allegedly associated with Expedia's Challenged Conduct do not outweigh the substantial harm to competition and consumers, and could be achieved through less restrictive alternatives.

129. But for Expedia's unlawful actions, members of the Direct-Booked Class would have paid lower prices for Direct-Booked Hotel Accommodations; and members of the OTA Class would have benefited from price competition among OTAs and would have paid lower prices for accommodations booked through Non-Expedia OTAs.

130. As a direct and proximate result of Expedia's monopolization, Plaintiffs and the Classes have paid overcharges and, therefore, suffered antitrust injury. Plaintiffs and the Classes are entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.

## XI. PRAYER FOR RELIEF

131. WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, respectfully pray for judgment against Defendant Expedia Group, Inc. and petition for the following relief:

a. an order certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

b. a judgment that Expedia's Challenged Conduct, as alleged herein, violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2;



TERRELL MARSHALL LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

c. an award of treble damages to Plaintiffs and the Classes pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, in an amount to be determined at trial;

d. a permanent injunction prohibiting Expedia from maintaining, enforcing, or reimposing the Challenged Conduct;

e. pre-judgment and post-judgment interest at the maximum rate permitted by law;

f. an award of reasonable attorneys' fees and costs of suit pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15; and

g. such other and further relief as this Court deems just and proper.

## XII. JURY TRIAL DEMAND

132. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED AND DATED this 2nd day of October, 2026.

TERRELL MARSHALL LAW GROUP PLLC

By: */s/ Beth E. Terrell*
Beth E. Terrell, WSBA #26759
Email: bterrell@terrellmarshall.com

By: */s/ Blythe H. Chandler*
Blythe H. Chandler, WSBA #43387
Email: bchandler@terrellmarshall.com

1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

Eric L. Cramer, *Pro Hac Vice Forthcoming*
Email: ecramer@bergermontague.com
Dennie Zastrow, *Pro Hac Vice Forthcoming*
Email: dzastrow@bergermontague.com
Jeremy Gradwohl, *Pro Hac Vice Forthcoming*
Email: jgradwohl@bergermontague.com
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Telephone: (215) 875-3000

Robert E. Litan, *Pro Hac Vice Forthcoming*
Email: rlitan@bergermontague.com
BERGER MONTAGUE PC
1001 G Street, NW, Suite 400 East
Washington, DC 20001
Telephone: (202) 559-9740

Edward Normand, *Pro Hac Vice Forthcoming*
Email: tnormand@fnf.law
Kyle Roche, *Pro Hac Vice Forthcoming*
Email: kroche@fnf.law
Stephen Lagos, *Pro Hac Vice Forthcoming*
Email: slagos@fnf.law
Joseph Lemoine, *Pro Hac Vice Forthcoming*
Email: jlemoine@fnf.law
FREEDMAN NORMAND FRIEDLAND LLP
155 E. 44th Street, Suite 915
New York, New York 10017
Telephone: (646) 494-2900

*Counsel for Plaintiffs and the Proposed Classes*